UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH A. GOUZE,

        Plaintiff,                          Civil Action No. 12-13179

      v.                                District Judge Sean F. Cox
                                              Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Plaintiff Kenneth A. Gouze appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12 & 14). For the reasons set forth below, this Court finds that substantial evidence does not support the Commissioner's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Plaintiff left his family home at the age of 13 or 14 after suffering harrowing experiences of childhood abuse. (Tr. 239.) After escaping his abusive home, Plaintiff lived out of garages and only completed the ninth grade. (*Id*.) Plaintiff has been in psychotherapy and on medications his entire adult life to assist with symptom management. Even with counseling and prescription assistance, Plaintiff alleges that his depression and post-traumatic stress disorder and their effects—specifically his ability to concentrate and keep pace—preclude him from maintaining full-time work. (Tr. 46-47.)

### A. Procedural History

In January 2008, Plaintiff applied for disability insurance benefits and supplemental security income, asserting in both applications that he became unable to work on August 15, 2001. (Tr. 96-98, 99-107.) The Commissioner initially denied both applications on April 21, 2008. (Tr. 57.) Plaintiff then requested an administrative hearing, and on October 14, 2009, he appeared *pro se* before Administrative Law Judge Mary Ann Poulose who considered his case *de novo*. (Tr. 22-56.) In a March 26, 2010 decision, ALJ Poulose found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 18.) The ALJ's decision became the final decision of the Commissioner on June 4, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-3.) Plaintiff filed this suit on July 19, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

In February 2005, Dr. Someswara Navuluri conducted an annual psychiatric evaluation of Plaintiff. (Tr. 318.) Plaintiff was referred from Detroit Receiving Hospital because of depression, anxiety, panic attacks, bed wetting, and insomnia. (*Id*.) A history of childhood abuse was noted in

Plaintiff's past history. (*Id*.) Dr. Navuluri noted that Plaintiff's memory was intact, but his insight was limited. (Tr. 319.) Dr. Navuluri diagnosed Plaintiff with depressive disorder, alcohol and marijuana abuse, personality disorder, and ruled out post-traumatic stress disorder ("PTSD"). (*Id*.) Dr. Navuluri assigned Plaintiff a GAF score of 55.[1] (*Id*.)

On March 31, 2006, Dr. Navuluri conducted an annual psychiatric evaluation of Plaintiff. (Tr. 316-17.) Plaintiff admitted to hearing voices, but his sense of reality was good. (Tr. 317.) At that time, Plaintiff had no command hallucinations, although his affect was shallow and his mood was anxious. (*Id*.) Plaintiff's memory was good, though his insight was limited. (*Id*.) Dr. Navuluri deemed Plaintiff's prognosis "guarded" and diagnosed him with depressive disorder, PTSD, alcohol and marijuana abuse, personality disorder, and assigned him a GAF of 56. (Tr. 317.)

On February 23, 2007, Dr. Navuluri conducted another evaluation. (Tr. 205-06.) Dr. Navuluri indicated that she had evaluated Plaintiff a year prior at which time Plaintiff was diagnosed with depressive disorder, PTSD, and alcohol and marijuana abuse and dependence. (Tr. 205.) Dr. Navuluri indicated that Plaintiff had been participating in the Dual Diagnosis Mental Illness Substance Abuse Program ("DD/MISA") and had been attending Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. (*Id*.) Dr. Navuluri reported that Plaintiff was "doing

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* (*"DSM-IV"*), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

much better"; Plaintiff still complained of insomnia and anxiety, though these problems seemed to be less severe with medication. (*Id*.) Dr. Navuluri also noted traumatic early childhood experiences, resulting in tremors and the need for intensive therapy. (*Id*.) Regarding his mental status, Dr. Navuluri noted that Plaintiff's affect was shallow and his mood was anxious and labile. (Tr. 206.) Plaintiff's insight was limited, but his memory was intact. (*Id*.) Dr. Navuluri rated Plaintiff's GAF score a 58. (*Id*.)

On April 23, 2007, Dr. Navuluri saw Plaintiff for a medication review and indicated that Plaintiff was doing much better. (Tr. 251.) Plaintiff was participating in the DD/MISA program and was attending AA and NA meetings. (*Id*.) Plaintiff reported that his depression was "lifting." (*Id*.)

On May 21, 2007, Dr. Navuluri saw Plaintiff for a medication review and indicated that Plaintiff was doing well. (Tr. 250.) Plaintiff was taking his medications and reported that they were "helping him a lot." (*Id*.)

On June 22, 2007, Dr. Navuluri saw Plaintiff for a medication review and indicated that he was "doing well." (Tr. 249.) He was taking his medications and was very happy with treatment. (*Id*.)

On July 20, 2007, Dr. Navuluri saw Plaintiff for a medication review and indicated that he was "doing much better" and his depression "has been lifting." (Tr. 247.) Moreover, Plaintiff was no longer hearing voices and was not suicidal. (*Id*.) Plaintiff had been participating in the DD/MISA program and was attending AA and NA meetings. (*Id*.)

On September 14, 2007, Dr. Navuluri saw Plaintiff for a medication review and indicated that he was "doing well" although he admitted to being "unhappy, depressed, and talk[ed] about his past life and losses in family and he want[ed] to get some counseling." (Tr. 242.) Although Plaintiff

had been alcohol and drug-free for six months, Dr. Navuluri indicated that Plaintiff still appeared "depressed and sad." (*Id.*) He was, however, "medically stable." (*Id.*)

On October 2, 2007, Plaintiff was referred to psychologist Anne Kennedy for individual psychotherapy due to episodes of high anxiety secondary to PTSD. (Tr. 240.) Plaintiff reported his abusive family background to Dr. Kennedy—including cowering under his bed to avoid beatings from his heroin-addicted father. (Tr. 241.) Plaintiff also reported that his father once shot a gun "all around" his brother and him, but did not hit them. (*Id.*) Plaintiff was still waking up under the bed "peeing on [himself.]" (*Id.*)

On October 5, 2007, Kennedy conducted a psychosocial assessment to develop a treatment plan for Plaintiff. (Tr. 238.) Kennedy indicated that Plaintiff had suicidal ideation and was provided information regarding group therapy. (Tr. 239.) Plaintiff reported that he left home at 13 or 14 and lived in garages to avoid being beaten by his father. (*Id.*) He continued to attend school, but only through the ninth grade. (*Id.*) Plaintiff also reported that his young daughter died a few years ago of sudden infant death syndrome. (*Id.*) Plaintiff indicated that he has heard the voice of his dead daughter and the devil ever since. (*Id.*) Plaintiff reported that his medications help to make the voices less intense. (*Id.*)

On November 29, 2007, Dr. Navuluri saw Plaintiff for a medication review and noted that he was doing "much better." (Tr. 223.) At that time Plaintiff was taking several medications and was attending intensive counseling. (*Id.*) Dr. Navuluri considered Plaintiff "medically stable." (*Id.*) During the interview, Dr. Navuluri judged Plaintiff to be "alert, cooperative, appropriate, and was not in any acute distress." (*Id.*) Plaintiff missed several group therapy sessions during 2007-08. (Tr. 207, 213, 215, 221, 226, 228, 230, 232, 234.)

On April 2, 2008, Dr. Cynthia Shelby-Lane conducted a consultative evaluation of Plaintiff's physical condition. (Tr. 253-62.) In addition to Plaintiff's physical impairments, Dr. Shelby-Lane noted that Plaintiff had a history of bipolar disorder and depression starting in 2002. (Tr. 253.) Plaintiff also had a history of mood swings, anger, crying spells, sadness, suicidal thoughts and attempts, and episodes of anger and rage. (*Id.*) Plaintiff was taking prescription medications and was seeing two mental health professionals on a regular basis. (*Id.*) Dr. Shelby-Lane noted that Plaintiff was positive for bipolar disorder since 2002. (Tr. 254, 256.)

On April 2, 2008, Plaintiff's mental condition was evaluated by Dr. M. Dibai. (Tr. 264-67.) Dr. Dibai noted that Plaintiff appeared angry, hostile and volatile. (Tr. 266.) Plaintiff's attitude and behavior was "distant and unfriendly," "dependent," and "amotivational with poor insight." (*Id.*) Regarding Plaintiff's mental trend and thought content, Dr. Dibai noted:

> The patient subjectively experiences hearing voices of spirits, ghosts and devils, particularly at a time of heightened stress. During the interview, he did not appear to be overtly responding to internal stimuli nor did he present delusional conviction of any theme. The patient claimed that he feels worthless. He denied suicidality. He expressed feelings of intense, inner anger and demonstrated propensity to project on others, particularly at a time of heightened anger, particularly when he is out of control and not on medications. He has propensity to hurt someone else but not anyone in particular. During the interview, he denied suicidality and homicidality. The patient claimed that due to therapy, particularly attending group therapy, he has learned how to manage his anger [by] walking around the block. The patient has been experiencing vegetative dysfunction, chronic insomnia, nightmares, intrusive thoughts of trauma that he had experienced in the past and intrusive thoughts during waking hours as he stated, "I can see it. I can touch it." The patient's appetite and weight have been fluctuating but generally are unfavorable and he is losing both dimensions.

(*Id.*) Dr. Dibai noted that Plaintiff had impairments with both his immediate and recent memory, and he was unable to perform serial 7s from 100 calculations, or serial 3s from 20. (Tr. 267.) Dr.

6

Dibai diagnosed Plaintiff with bipolar disorder, mixed type, with psychotic features, chronic post traumatic stress disorder, and antisocial personality disorder. He assigned Plaintiff a GAF of 30.[2] (Tr. 267.) Dr. Dibai indicated that Plaintiff's prognosis was "guarded." (*Id.*)

On April 17, 2008, Dr. James Tripp completed a psychiatric review technique of Plaintiff. (Tr. 279-92.) Dr. Tripp noted affective disorders evidenced by bipolar syndrome. (Tr. 282.) Dr. Tripp also noted anxiety-related disorders, recurrent and intrusive recollections of a traumatic experience, which were a source of marked distress. (Tr. 284.) Plaintiff was also noted to have personality disorders which cause either significant impairment in social or occupational functioning or subjective distress as evidenced by pathological inappropriate suspiciousness or hostility and persistent disturbances of mood or affect. (Tr. 286.) Plaintiff also had substance abuse disorders. (Tr. 287.) With respect to Plaintiff's functional limitations, Dr. Tripp concluded that Plaintiff was mildly limited in his activities of daily living, moderately limited in his ability to maintain social functioning, and moderately limited in his ability to maintain concentration, persistence, or pace. (Tr. 289.) Dr. Tripp opined that Plaintiff could perform "simple, sustained unskilled tasks with persistence." (Tr. 291.)

On the same day, Dr. Tripp also completed a residual functional capacity assessment. (Tr. 293-96.) Dr. Tripp noted that Plaintiff was moderately limited in his ability to understand and remember detailed instructions. (Tr. 293.) Dr. Tripp also made conclusions regarding Plaintiff's sustained concentration and persistence including that he was moderately limited in his ability to

---

[2] A GAF score of 21 to 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *DSM-IV* at 34.

carry out detailed instructions, and maintain attention and concentration for extended periods. (*Id*.) Plaintiff was also deemed moderately impaired in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id*.) With respect to Plaintiff's ability to adapt, he was deemed moderately impaired in his ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others. (Tr. 294.)

On July 11, 2008, Dr. Bens Sandaire conducted an annual psychiatric examination of Plaintiff. (Tr. 312-13.) Plaintiff's complaints included anxiety, panic attacks, insomnia, rapid mood swings, high energy, racing thoughts, pressured speech, agitation, irritablity and hearing voices. (Tr. 312.) Dr. Sandaire noted that some symptoms were chronic, but others had recently been "exacerbated—worsening now for greater than ten years." (*Id*.) Moreover, Dr. Sandaire noted that Plaintiff's "psychosocial stressors are overwhelming," but medications have been helpful. (*Id*.) A mental status exam showed

> good grooming, timeliness, orientation times four, anger, irritable behavior, logical and coherent thought process, intact judgment, normal speech, good eye contact, no delusional thought, no obsessive or compulsive thought, average intelligence, fair insight and noncommand auditory hallucinations. After careful assessment of self-harm risk, the patient was determined to have no current suicidal thoughts, intent or plan. Regarding thoughts of harm toward others, there were no homicidal thoughts, plans or intent.

(Tr. 313.) Dr. Sandaire assessed Plaintiff to have schizoaffective disorder, bipolar mixed, and

assigned Plaintiff a GAF score of 48.[3]  Dr. Sandaire conducted a similar exam a year later with almost identical conclusions.  (Tr. 310.)  Medical progress notes from July 9, 2008, until March 3, 2010, all indicated similar findings.  (Tr. 320-28.)

### C. Testimony at the Hearing Before the ALJ

#### 1. *Plaintiff's Testimony*

The ALJ informed Plaintiff about his right to be represented at the hearing; however, Plaintiff indicated that he wanted to proceed unrepresented.  (Tr. 29.)  Plaintiff indicated that he only completed the ninth grade and was in special education classes.  (Tr. 32.)  The last time Plaintiff worked was in 2001 or 2002 as a fabricator, working with chemicals.  (*Id.*)  Plaintiff testified that he left that job because he was having breathing problems.  (Tr. 33.)  Plaintiff also worked washing dishes, as a home health care provider, doing temporary work, as a machinist, and as a machine operator.  (Tr. 32, 34-36.)

Plaintiff indicated that he had a driver's license, but did not have a car.  (Tr. 37.)  Plaintiff also reported that he could take care of his personal needs, but it took some time to do it.  (*Id.*)  Plaintiff also reported that he was able to do the laundry, take out the trash, mow the lawn, and shovel the snow, but only at his own pace.  (Tr. 38.)  Plaintiff also testified to going grocery shopping with his girlfriend, however, Plaintiff reported having difficulty reading from a grocery list.  (Tr. 38-39.)

Plaintiff testified that he sees a therapist for his mental health issues on a weekly or bi-

---

[3] A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM-IV* at 34.

weekly basis. (Tr. 39.) Plaintiff reported to seeing a psychiatrist on a monthly or bi-monthly basis. (*Id.*) Plaintiff reported taking Cymbalta, Depatoke, Seroquel, Envague, and Klonopin. (Tr. 40.) Plaintiff indicated that these medications left him feeling tired and needing a two to two-and-one-half hour nap per day. (*Id.*)

Plaintiff reported that his hands lock up on him and will not let go. (Tr. 41.) Plaintiff also reported that when he sits too long, his back locks up, and when he stands too long, his legs cramp up. (Tr. 42.) Plaintiff reported getting "achy" and then having sharp pains in his back, collar bones, head, hands, fingers, arms and elbows. (Tr. 50.) Plaintiff reported that he wore hand and back braces except while he was sleeping. (Tr. 51.) Plaintiff estimated that he could sit fifteen minutes before needing to stand up or move around. (Tr. 42.) Plaintiff estimated that he could stand for forty-five minutes to an hour before needing to sit down. (*Id.*) Plaintiff reported that he was flat-footed, but that he could squat down to pick something off the floor. (Tr. 42-43.) Plaintiff testified that he could reach shoulder-height to grab something, but not overhead. (Tr. 43.) Plaintiff reported no problems holding utensils or cups, but reported that the cold bothered him. (Tr. 44.)

Plaintiff reported problems with concentration. (Tr. 46.) Plaintiff testified about negative experiences in the workplace stemming from his lack of concentration and slow speed. (Tr. 46-47.) Plaintiff also reported problems in group therapy because of his concentration issues. (Tr. 48.) Plaintiff testified to hearing voices everyday, including the devil's voice. (*Id.*) Plaintiff indicated that despite taking medication, the devil would tell him things like: "go hurt somebody, [or] hurt myself." (*Id.*) Plaintiff testified to a severely abusive childhood. (Tr. 49.) Plaintiff reported that his childhood abuse continued to plague him in the form of severe nightmares of being shot, needing to sleep underneath his bed, and suffering from bed-wetting as an adult. (*Id.*)

10

Plaintiff testified that he had not used alcohol or drugs in about 26 months. (Tr. 49.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations the ALJ believed approximated Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of "unskilled work that required only occasional interaction with the public and co-workers and was limited to simple routine and repetitive and no written communication[.]" (Tr. 53.) The ALJ also limited the hypothetical individual to the light level of exertion. (*Id*.) The VE testified that the hypothetical individual would not be able to perform Plaintiff's past work; however, he or she would be able to perform work as a hand packer, hand assembler, or as a hand sorter. (*Id*.)

If the hypothetical individual were limited to occasional production, i.e., no fast-paced production or work, the VE testified that the above-listed jobs would be eliminated. (Tr. 54.)

The ALJ then asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of "unskilled, only occasional public and co-worker, simple routine, repetitive, no written communication and light. So that was hypothetical one, plus only occasional postural, so bending, crouching, crawling, climbing." (*Id*.) The VE responded that the same jobs would be available as in hypothetical one. (*Id*.) If the individual needed a sit/stand option, there would be a fifty-percent erosion of the available jobs. (*Id*.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730

11

(6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Poulose found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of August 15, 2001. (Tr. 11.) At step two, she found that

Plaintiff had the following severe impairments: depressive disorder, post-traumatic stress disorder, and back pain after 2008. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 12.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except where he would only be required to perform unskilled, simple, repetitive, routine work; only occasionally work with the general public or coworkers; would not be required to read written communications (for example, blueprints); and would only occasionally be required to perform postural activities such as stooping, crouching, crawling, kneeling and climbing.

(Tr. 14) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 16.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 17.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of her decision. (*Id.*)

### III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

### A. The Hearing

Plaintiff alleges that the ALJ failed to develop the record at the hearing regarding his concentration, persistence or pace limitations and how those limitations would affect his ability to sustain full-time employment. (Pl.'s Mot. Summ. J. at 9, 13.)

14

The Supreme Court has held that the "ultimate responsibility" for ensuring that a claimant receives a full and fair hearing lies with the administrative law judge. *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971). The ALJ, however, must not become partisan and assume the role of counsel: "The social security hearing examiner . . . does not act as counsel. He acts as an examiner charged with developing the facts." *Id.* at 410. Courts of Appeals expounding on the *Perales* doctrine have imposed a special duty on ALJ's where a claimant appears without counsel. In *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002), the Sixth Circuit held that "when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures," an ALJ has "a special, heightened duty to develop the record." *Id.* (citing *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 856 (6th Cir.1986); *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). To satisfy this special duty, the administrative law judge must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Lashley*, 708 F.2d at 1052. Whether an ALJ has fully developed the record must be determined on a case-by-case basis. *Id.*

Here, Plaintiff was not represented at the hearing. While he waived the right to counsel, Plaintiff was unfamiliar with the hearing procedures, and the record unquestionably confirms Plaintiff's mental limitations which limited him from presenting an effective case. This triggered a special, heightened duty to develop the record on the part of the ALJ, which did not occur here with respect to Plaintiff's concentration, persistence or pace limitations and how those limitations would affect his ability to sustain full-time employment. *See Nabours*, 50 F. App'x at 275; *Lashley*, 708 F.2d at 1051-52.

The Commissioner argues that the ALJ adequately questioned Plaintiff regarding his

15

concentration, persistence or pace limitations, specifically noting that Plaintiff testified that he could perform calculations, assist his daughter with homework, shop, and accomplish other tasks independently. (Def.'s Mot. Summ. J. at 9.) And, that these abilities demonstrated that Plaintiff could sustain attention sufficiently long enough to appropriately complete tasks commonly found in simple, routine, and repetitive work settings despite Plaintiff's moderate mental impairment. (*Id*. at 11.) However, the Court finds significant that Plaintiff testified that he was only able to do many of the activities of daily living supporting the ALJ's CPP conclusion "at [his own] pace." (Tr. 38.) In one instance, the ALJ inquired whether Plaintiff had "any problems taking care of [his] personal needs, like getting dressed, getting bathed, putting on your socks or shoes, belts?" (Tr. 37.) Plaintiff responded that it took some time to do it, but the ALJ did not inquire how long it took to get dressed or bathed. (*Id*.) Plaintiff also indicated that he had problems with forgetfulness, yet the ALJ did not follow-up on that line of questioning. (*Id*.) Plaintiff also indicated that he could take out the trash, mow the lawn, or shovel snow, but "[a]t my pace . . . I can do things, but to my limits. I can't be like other people, rush through it." (Tr. 38.) The ALJ made no attempt to quantify how long it took Plaintiff to accomplish these tasks, or whether he needed breaks. The Commissioner also argues that Plaintiff can shop for his own groceries, but Plaintiff actually testified that his girlfriend does the grocery shopping, or they go together. (Tr. 38-39.) Moreover, Plaintiff testified that he had difficulty reading from a grocery list. (*Id*.) The Commissioner also argues that Plaintiff can assist his nine year-old daughter with her homework. Yet, the ALJ did not question Plaintiff about how long he spent with his daughter on homework, or whether he needed breaks.

The Sixth Circuit has held that "superficial questioning of inarticulate claimants or claimants with limited education is likely to elicit responses which fail to portray accurately the extent of their

limitations." *Lashley*, 708 F.2d at 1053. More probing questions concerning how often an activity is performed, how long an activity can be sustained, and what adverse consequences Plaintiff suffers as a result of the activity, would provide more probative information concerning his mental limitations. *Id.* Here, as in *Lashley*, the superficial quality of the questioning deprived this *pro se* Plaintiff with only a ninth grade education and a long history of mental illness a full and fair hearing. A remand is necessary to more fully develop the record regarding Plaintiff's mental limitations and whether, specifically, his concentration, persistence or pace limitations affect his ability to sustain full-time employment.

### B. The RFC Analysis & Hypothetical Questions

Plaintiff alleges that the record does not support the ALJ's conclusion that he has the ability to perform "unskilled, simple, repetitive, routine work." (Pl.'s Mot. Summ. J. at 9-10.) Plaintiff also argues that the ALJ's hypotheticals to the VE did not account for the severity of his CPP limitations. (*Id*. at 11-16.)

In light of the Court's conclusion in Part A, the Court will not address these claims of error, but will leave it to the ALJ to determine whether, with an expanded record, she believes the RFC needs to be amended to more adequately address Plaintiff's CPP limitations.

### V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
UNITED STATES MAGISTRATE JUDGE

Dated: July 16, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 16, 2013.

s/Jane Johnson  
Deputy Clerk

18